UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **IRON HORSE TRANSPORT, LLC d/b/a DPF ALTERNATIVES OF ROANOKE,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO. 3:24-CV-2133-B** |
| **DET DIESEL EMISSION TECHNOLOGIES LLC, and SYNERGY CATALYST LLC,** | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion for Partial Summary Judgment (Doc. 117) filed by Defendants DET Diesel Emission Technologies LLC and Synergy Catalyst LLC (together, "DET"). Having reviewed the briefing, facts, and applicable law, the Court **GRANTS** DET's Motion.

## I.

## BACKGROUND

This case is one among several between DET and affiliates of DPF Alternatives, LLC.[1] DET provides products and services for diesel engines, and DPF Alternatives franchises individual service locations for diesel-engine vehicles. The DPF Alternatives-affiliate in this case is Plaintiff Iron Horse Transport, LLC ("Iron Horse"). Iron Horse is a Virginia-based franchise of DPF Alternatives, and

[1] For additional background on the larger dispute, see *DPF Alts., LLC v. DET Diesel Emission Techs., LLC*, No. 3:24-cv-1953-B, 2025 WL 1908170, at *1 (N.D. Tex. July 10, 2025) (Boyle, J.); and *DPF Alts., LLC v. DET Diesel Emission Techs., LLC*, No. 3:24-cv-1953-B, 2025 WL 3089688, at *1 (N.D. Tex. Nov. 5, 2025) (Boyle, S.J.).

its sole member and manager is James Ashworth. This case is about Ashworth/Iron Horse's dissatisfaction from having signed up to use DET's product/service called Recore.

DET moved for partial summary judgment based on (1) the lack of support for some of Iron Horse's claims in Ashworth's deposition testimony and (2) the terms of a "Master Services Agreement" between DET and Iron Horse. For purposes of the present motion, the facts contained in Ashworth's deposition testimony and the Master Services Agreement document are undisputed.

Iron Horse first entered the diesel particulate filter servicing industry in 2019. *See* Doc. 122, App. Resp., Ashworth Dep., 24:10–19. Diesel particulate filters are devices that catch "soot" from diesel fuel exhaust in vehicles that run on diesel fuel. *See id.* at 24:20–24. Once a filter is full of soot, the filter must either be cleaned or replaced. *See id.* at 24:24 to 25:1. In Iron Horse's shop, when customers bring in their diesel vehicles for servicing, Iron Horse either removes, cleans, and reinstalls the filter or replaces the old filter with a new one. *See id.* at 45:10–15.

Ashworth, as owner of the Iron Horse franchise of DPF Alternatives, regularly attended Zoom meetings for all DPF Alternatives franchises, *see id.* at 59:18 to 60:2—it was at one of these meetings that Ashworth first encountered DET. Generally, in those regularly occurring meetings, DPF Alternatives would announce new tools that the franchises could use in their business. *See id.* at 20:19–25. At the September 2021 meeting, DPF Alternatives invited DET's representative Peter Lambe to present DET's new "patented process" for servicing filters. *See id.* at 68:3–11, 69:12–14. As Ashworth understood it, DET's service differed from what Iron Horse already did by allowing a servicer to replace not just the filter, but the can that houses the filter, or the "core." *See id.* at 33:25 to 34:9, 37:5 to 38:21. DET's new product was called "Recore." *See id.* at 68:13–15.

At that 2021 Zoom meeting, DET presented Recore marketing material on-screen and directed the DPF Alternatives franchisees to the Recore website. *See id.* at 69:15–25. The materials and website repeated the claim that Recore was a "patented process" or a "patented-proven process." *See id.* DPF Alternatives was on good terms with DET at the time and indicated that they were hoping to partner with DET to bring Recore to the franchisees. *See id.* at 74:8–23.

But Ashworth was not impressed: he was "reluctant to get involved with Recore" because he "didn't really see it being a . . . good fit" in Iron Horse's market region. *Id.* at 101:1–8. Ashworth expressed his reluctance to Lambe "several times when [Lambe] was trying to get [Ashworth] to sign on to [Recore] in '21." *Id.* at 101:4–6.

The next summer, however, a nearby businessowner—who had bought Recore equipment but was unsure if he would actually use it—walked into Ashworth's shop and sparked the idea of Iron Horse buying Recore equipment from him. *See id.* at 80:14–24. Ashworth reached out to Lambe to discuss buying the nearby businessowner's equipment and entering into a contract with DET to govern use of the Recore system. *See id.* at 81:3–11.

Ashworth still did not entirely see the value of adding Recore to Iron Horse's lineup of services, but Lambe told him that DET had "two or three buyers lined up" for the exclusive license to use Recore in the region. *See id.* at 101:13–25. Wanting to get ahead of his regional competition, Ashworth signed Iron Horse up for Recore. *See id.* at 101:9–11, 101:25 to 102:1. At the time, DPF Alternatives had designated DET as an "approved vendor" for DPF Alternatives' franchisees. *Id.* at 89:1–6.

In August 2022, DET and Iron Horse entered into the Master Services Agreement for a five-year term. *See* Doc. 122, App. Resp., Master Servs. Agreement, 1. The Agreement defines the phrase

"DET Intellectual Property" as including "equipment specifications and designs, processes, procedures, methods, training materials, tooling created using the DET Intellectual Property, and all copyrights, trademarks and patentable rights related thereto." *Id.* Through the Agreement, DET licensed Iron Horse to use the DET Intellectual Property, including in connection with "the methods and procedures for use in the extraction of the Cores." *Id.* Although Iron Horse would own the equipment, Iron Horse agreed that it could not "use the Equipment without being subject to DET's licenses regarding the DET Intellectual Property." *Id.* at 2–3. And Iron Horse could not sell the equipment to any third party, nor could Iron Horse assign away its rights under the Agreement without DET's prior written consent. *See id.* at 3, 9.

Before Iron Horse had even received the Recore equipment, in September 2022, DPF Alternatives notified its franchisees that Recore was no longer an authorized vendor. *See* Doc. 122, App. Resp., Ashworth Dep., 63:13 to 64:7. That notification resulted from a dispute between DET and DPF Alternatives with which Ashworth and Iron Horse were not involved. *See id.* at 103:8–20. Yet, sensing that using the unauthorized machine would put him in "hot water" with his franchisor, Ashworth put the Recore system to the side and did not use it. *See id.* at 61:11–23.

In the next couple of months after receiving Recore, Ashworth learned that Recore actually was not patented. *See id.* at 69:25 to 70:4. Around that time, Iron Horse, acting through Ashworth, started trying to get out of the Master Services Agreement but was unsuccessful. *See id.* Unable to exit, Iron Horse continued to make monthly payments towards purchasing Recore—which, in Ashworth's words, was "something that sits in my shop and is absolutely of no value to me." *Id.* at 61:11–13.

Since then, Iron Horse has never used the Recore machine or any other machine that performed the same core-replacement process. *See id.* at 32:13–24, 100:6–14. Nor does Ashworth have any plans to incorporate core-replacement services into Iron Horse's business. *See id.* at 100:15–24. At the end of the day, Ashworth returned to his original view that he didn't "see market for [Recore] in [his] territory," and "nobody seem[ed] interested in" core-replacement services. *See id.* at 119:6–9. Later, DET sent Ashworth a letter terminating the Master Services Agreement. *See id.* at 21:16–17.

Meanwhile, Iron Horse has remained a franchisee of DPF Alternatives. *Id.* at 63:3–5. Although the inability to use Recore has caused Iron Horse financial strain, DPF Alternatives has not communicated to Iron Horse that their franchise relationship has been affected. *See id.* at 62:25 to 63:2, 63:9–12.

Iron Horse originally sued DET in the U.S. District Court for the Western District of Virginia. *See* Doc. 1, Compl. That court transferred the case to this Court based on a forum-selection/choice-of-law clause in the Master Services Agreement. *See* Doc. 59, Mem. Op., 8, 17. The clause reads:

> Governing Law; Venue. This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of Texas, without regard to its conflicts of laws principles. Exclusive venue for any proceeding relating to this Agreement shall lie with the state and federal courts located in Dallas County, Texas.

Doc. 122, App. Resp., Master Servs. Agreement, 9.

Iron Horse brought eight causes of action, but only five are challenged by DET's motion for partial summary judgment. The challenged causes of action are: (1) false marking under 35 U.S.C. § 292, (2) false description under 15 U.S.C. § 1125(a), (3) monopolization under 15 U.S.C. § 2, (4)

tortious interference with contract, and (5) unlawful cancellation of franchise under Virginia Code section 13.1-564. The Court considers DET's summary-judgment challenge below.

## II.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007) (citation omitted). To determine whether a genuine dispute exists, the Court views the evidence in the light most favorable to the nonmovant. *Muñoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000) (citations omitted). When the nonmovant would bear the burden of proof on an issue at trial, the movant can secure summary judgment "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the movant has established the absence of genuine dispute as to a material fact, the burden shifts to the nonmovant, who must show that summary judgment is not appropriate. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' . . . or by only a 'scintilla' of evidence." *Id.* (other citations omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). A nonmovant with the burden of proof must "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics*

*Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). Finally, the evidence that any party proffers "must be competent and admissible at trial." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citation omitted).

**III.**

**ANALYSIS**

Viewing all evidence in the light most favorable to Iron Horse, no reasonable juror could rule in its favor on the five challenged causes of action. The Court addresses each challenged cause of action in turn below.

*A. For False Marking, Iron Horse Has Not Suffered "Competitive Injury."*

The false-marking statute prohibits falsely marking an article as patented. *See* 35 U.S.C. § 292(a). As relevant here, violators include "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented, for the purpose of deceiving the public." *Id.* DET does not challenge that Ashworth's deposition could support that DET violated the false-marking statute by advertising Recore as patented when it was not.

Instead, DET challenges whether Iron Horse can provide evidence to support the statutory standing requirement for a false-marking claim. *See* Doc. 118, Br. Mot., 5–9. Only "[a] person who has suffered a competitive injury as a result of a violation" can bring a lawsuit for compensatory damages. *See* § 292(b). Below, the Court first explains the "competitive injury" requirement and then applies the requirement to this case.

1. The "Competitive Injury" Requirement

To bring a private civil lawsuit for false marking, the plaintiff must have suffered "competitive injury," as that phrase is used in the statute, caused by the defendant's violation of the statute. *See Sukumar v. Nautilus, Inc.*, 785 F.3d 1396, 1400 & n.3 (Fed. Cir. 2015).

Both actual and potential competitors can suffer competitive injury. *See id.* at 1400. "[A] potential competitor may suffer competitive injury if it has attempted to enter the market." *Id.* "An attempt is made up of two components: (1) intent to enter the market with a reasonable possibility of success, and (2) an action to enter the market." *Id.* In contrast, the statute "does not confer standing upon any entity that claims a subjective intent to compete." *Id.* at 1402. In other words: "Dreaming of an idea but never attempting to put it into practice is insufficient. Otherwise, market entry is too speculative and, thus, competition cannot be harmed by the false marking." *Id.*

To interpret "competitive injury" as the phrase is used in § 292, the Federal Circuit in *Sukumar* started with the phrase's "plain meaning" as defined in a legal dictionary: "[a] wrongful economic loss caused by a commercial rival, such as the loss of sales due to unfair competition; a disadvantage in a plaintiff's ability to compete with a defendant, caused by the defendant's unfair competition." *Id.* at 1400 (quoting *Competitive Injury*, *Black's Law Dictionary* (9th ed. 2009)). Though illuminating, the Federal Circuit explained that this definition was "hardly conclusive" as to the meaning of "competitive injury" in all cases. *See id.* at 1400–01.[2]

[2] To further inform the meaning of "competitive injury," the Federal Circuit consulted the statute's legislative history, the use of the term "injury to competition" in the antitrust context, and the law's policy rationale. *See id.* at 1401–02. These sources explained that the "competitive injury" requirement was added to prevent "unrelated, private third parties" from suing and that "competitive injury" must include altogether preventing market entry. *See id.* While relevant to the overall meaning of "competitive injury," those ideas are not relevant to this case. Iron Horse is not an "unrelated, private third party," and there is no allegation that DET's false marking of Recore (as opposed to other actions by DET) prevented Iron Horse from entering the filter-servicing market generally or the core-replacement market specifically.

A Federal Circuit case that predates Congress's addition of the "competitive injury" requirement—*Forest Group, Inc. v. Bon Tool Co.*—suggests that false-marking violations cause injury to competing inventors. *See* 590 F.3d 1295, 1302–03 (Fed. Cir. 2009). Because marking something as patented signals to the public that the marked item cannot be copied, falsely marking something as patented "deter[s] innovation and stifle[s] competition in the marketplace." *Id.* (citations omitted). For example, an inventor might forgo research due to fear of possibly infringing a falsely marked patent. *See id.* (citation omitted). Or, alternatively, the inventor might spend time, money, and energy in trying to design around the purported patent or in analyzing the patent's validity or enforceability. *See id.* (citation omitted).

Only two Federal Circuit cases meaningfully grapple with whether a set of facts gives rise to "competitive injury." The first is *Sukumar*, in which the plaintiff claimed to have been injured by falsely marked fitness machines sold by the defendant. *See* 785 F.3d at 1402–04. The plaintiff was a serial purchaser of the defendant's fitness machines, and his theory of injury was that he intended to modify and sell the machines as the defendant's competitor but was deterred from doing so by the false marking. *See id.* at 1402. The Federal Circuit found the evidence of the plaintiff's intent weak but could not rule out, for summary-judgment purposes, that the plaintiff subjectively intended to compete. *See id.* at 1403.

The *Sukumar* plaintiff's theory faltered, however, when it came to demonstrating action: the plaintiff had done nothing prior to filing the lawsuit to attempt to enter the market for manufacturing fitness machines. *See id.* at 1403–04. Although the plaintiff had retained someone to create a business plan, hired a firm to design a machine, consulted with engineers, and begun "talks" to set up his manufacturing business infrastructure, *all* of that activity was done mid-lawsuit after the

district court ruled that the defendant falsely marked some machines. *See id.* at 1399. Prior to the lawsuit, the only action the plaintiff had taken was purchasing over 100 machines from the defendant to "gain familiarity" with them. *See id.* at 1404. Simply purchasing machines was not enough to convince a reasonable juror that the plaintiff had taken the action necessary to suffer competitive injury because of the defendant's false marking. *See id.* at 1403–04.

In *Sukumar*, an alternative theory as to the plaintiff's intentions, which was better supported by the evidence, was that the plaintiff planned only to open rehabilitation centers where patrons could exercise using the fitness machines purchased from the defendant. *Id.* at 1403. Under that theory, the plaintiff's centers "would not operate in competition with" the defendant, so there would still be no false-marking competitive injury. *See id.* The Federal Circuit's handling of this alternative theory implies that a mere consumer of a falsely marked product does not suffer "competitive injury" under the false-marking statute.

The second Federal Circuit case grappling with facts constituting "competitive injury" is *Gravelle v. Kaba Ilco Corp.*, in which the defendant had falsely marked features of its key-cutting machine as "patent pending."[3] *See* 684 F. App'x 974, 976 (Fed. Cir. 2017) (per curiam). The plaintiff's theory of competitive injury depended on his two lines of key-cutting machines—one older and one newer—that, according to the plaintiff, competed with the defendant's machine. *See id.* The plaintiff's older line of key-cutting machines predated the defendant's falsely marked machine, and sales of the older line declined when the defendant started marketing its machine. *See id.* But the plaintiff had admitted at deposition that the reason for the decline was that he only had ten

---

[3] The false-marking statute prohibits falsely marking something as "patent pending" (or its equivalent) on the same terms as it prohibits falsely marking something as "patented." *See* § 292(a). The same "competitive injury" requirement applies as well. *See* § 292(b).

machines remaining in inventory to sell, so the injury was caused by his limited supply rather than by the defendant's false marking. *See id.* at 979.

For the *Gravelle* plaintiff's newer line of machines, the plaintiff also lacked evidence to tie a decrease in his product's value to the defendant's false marking. *See id.* Leaning on *Forest Group*'s inventor-focused theory of competitive injury, the Federal Circuit reasoned that the plaintiff lacked competitive injury because he

> advanced no evidence that he was deterred from introducing or continuing to market a product similar to [the defendant's] falsely marked one or from engaging in innovation in the field of [the defendant's] product, or that he incurred costs in designing around the features [the defendant] marked as subject to a pending patent.

*Id.* (citing *Forest Grp.*, 590 F.3d at 1302–03).

As a final attempt, the plaintiff submitted an affidavit asserting that the defendant's false marking of its machines as "patent pending" "*could* readily influence" buyers to choose the defendant's product over the plaintiff's. *See id.* at 979–80. But the plaintiff had no evidence supporting his speculation that buyers would change purchasing behavior based on the defendant's false label. *See id.* Finding no evidence to support that any injury was caused by the defendant's false marking, the Federal Circuit affirmed summary judgment in favor of the defendant. *See id.* at 980.

DET also raises a Southern District of California case as relevant: *Hebert v. Allied Rubber & Gasket Co.*, 632 F. Supp. 3d 1175 (S.D. Cal. 2022). In *Hebert*, the plaintiff owned a patent covering the wrench he invented, and he went into business with the defendant to distribute the wrench. *See id.* at 1178. During the business relationship, the defendant had permission from the plaintiff to mark the wrench with the plaintiff's patent. *See id.* Then, the relationship fell apart, and the defendant continued to sell the small remaining inventory with the plaintiff's patent marking. *See id.* at 1179. Assessing the plaintiff's argument that he was competitively injured by the defendant's

use of his mark,[4] the court held that there could be no competitive injury for the period in which the two parties were working together. *See id.* at 1186. And, for the period after the relationship went sour, the plaintiff made no attempt to sell his wrench as the defendant's competitor. *See id.* Thus, the plaintiff "neither suffered a loss of sales nor a competitive disadvantage to another company as a result of the patent marking." *Id.* (citing *Sukumar*, 785 F.3d at 1400).

The above-discussed cases suggest the following principles apply when assessing whether a plaintiff has statutory standing for a false-marking claim. False-marking competitive injury flows from the plaintiff competing as an inventor or would-be inventor. *See Forest Grp.*, 590 F.3d at 1302–03. A plaintiff can support standing by showing that it decided to forgo invention, invented around, or spent resources investigating patent validity as an actual or potential competitor in the field of the falsely marked product. *See id.*; *see also Gravelle*, 684 F. App'x at 979 (citing *Forest Grp.*, 590 F.3d at 1302–03). If a potential competitor, the plaintiff needs to demonstrate *action* behind its subjective intent to compete. *See Sukumar*, 785 F.3d at 1403–04. And the plaintiff's injury must demonstrably result from the defendant's false marking, not entirely from an independent source. *See Gravelle*, 684 F. App'x at 978–80. On the other hand, the plaintiff cannot be a mere consumer of the defendant's products who does not plan to compete, *see Sukumar*, 785 F.3d at 1403, nor can it be the defendant's business partner working together to sell the falsely marked product, *see Hebert*, 632 F. Supp. 3d at 1186.

[4] The false-marking statute prohibits marking anything with someone else's patent number without consent and with intent to imitate the patented invention or deceive the public. *See* § 292(a). Suing for this violation still requires competitive injury. *See* § 292(b).

2. Application to Iron Horse

Turning back to this case, Iron Horse has not suffered false-marking "competitive injury" because Iron Horse was not DET's actual or potential competitor in the field of core-replacement services. Iron Horse never performed a core replacement and never intends to perform a core replacement. *See* Doc. 122, App. Resp., Ashworth Dep., 32:13–24, 100:6–14. Even if Ashworth subjectively intended to perform core replacement, he took no action based on that intent. Rather, Iron Horse was merely DET's customer and business partner, which makes Iron Horse an unsuitable false-marking plaintiff under *Sukumar* and *Hebert*.

To argue for the opposite result, Iron Horse contends that the relevant market to examine is not the relatively niche core-replacement market but the more general filter-servicing market. *See* Doc. 121, Br. Resp., 7. In Iron Horse's view, it competed in the filter-servicing market and was prevented from adding the new service of core replacement to its lineup of filter services. *See id.* at 7–8. Iron Horse's view of the market does not accord with the principle that false-marking competitive injury is focused on inventors or would-be inventors in the field of the falsely marked item. The courts in *Sukumar*, *Gravelle*, and *Hebert* all focused their competitive-injury analysis on whether the plaintiff was competing as a manufacturer against the defendant's falsely marked product. Here, since Recore was falsely marked as a patented "process," Iron Horse would need to show that it was a competing developer of the same kind of core-replacement process. Yet, Iron Horse has no evidence that it intended to practice core-replacement at all, whether by using Recore or by developing a competing process. Because it did not intend to practice core-replacement, Iron Horse does not sit in the shoes of an inventor or would-be inventor of the relevant process and thus has not suffered false-marking competitive injury.

Even if Iron Horse could support that it would have practiced core replacement, the cause that prevented it from doing so was not DET's false marking. Ashworth's deposition possibly supports two reasons for Iron Horse never having practiced core replacement: (1) the instruction from DPF Alternatives to not use Recore and/or fear of tension with DPF Alternatives, and (2) Ashworth's lack of interest in the technology. Ashworth's deposition does not support that DET's false marking caused Iron Horse not to compete. As a result, no genuine dispute exists that Iron Horse lacks false-marking competitive injury.

*B. For False Description, Iron Horse Lacks Standing.*

The Lanham Act prohibits anyone from advertising or promoting a product using a "false or misleading description of fact" that "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).

Like with the false-marking statute, not just anyone can sue—only a "person who believes that he or she is or is likely to be damaged" by the false description. *See* § 1125(a)(1). "Though in the end consumers also benefit from the Act's proper enforcement, the cause of action is for competitors, not consumers." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014). The Supreme Court interpreted the statute as requiring a plaintiff to "allege an injury to a commercial interest in reputation or sales." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–32 (2014). A plaintiff cannot sue if he is merely "[a] consumer who is hoodwinked into purchasing a disappointing product" or "a business misled by a supplier into purchasing an inferior product." *Id.* at 132. The plaintiff must also show proximate cause: that its "economic or reputational injury

flow[s] directly from the deception wrought by the defendant's advertising," which "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133.

To illustrate the types of false description that are actionable under the Lanham Act, consider two Supreme Court cases. First, *Lexmark* involved an original manufacturer of print ink cartridges that wanted customers to return cartridges to it for refurbishment and resale, rather than sell the old cartridges to "remanufacturers" who would compete with the original manufacturer in the resale market. *See id.* at 120–21. The plaintiff was not a remanufacturer but supplied necessary components to the remanufacturers. *See id.* at 121. To induce customers to return their empty cartridges, the original manufacturer made allegedly misleading statements to end-consumers about their legal obligations and to remanufacturers about the legality of the plaintiff's business. *See id.* at 122–23. The plaintiff had statutory standing to sue under the Lanham Act because it alleged that the original manufacturer's false statements caused harm to the plaintiff's reputation and "position in the marketplace" as the supplier of remanufacturing components. *See id.* at 137–38.

Second, *POM Wonderful* involved two competing juice companies: the plaintiff alleged that sales of its "pomegranate-blueberry juice blend" were allegedly harmed by the defendant mislabeling its five-juice blend as "pomegranate blueberry." 573 U.S. at 105–06. The plaintiff's cause of action under the Lanham Act was "straightforward." *See id.* at 108. The plaintiff asserted "injury as a competitor" whose juice sales were affected by the defendant's false description of its competing juice product to consumers. *See id.* at 107.

Iron Horse has not raised evidence to support that it suffered an "injury to a commercial interest in reputation or sales" that was caused by DET falsely describing Recore as "patented" to Iron Horse's consumers. DET did not disparage Iron Horse's business to would-be customers, as did

the original ink-cartridge manufacturer in *Lexmark*. Nor did DET misleadingly describe its process to Iron Horse's would-be customers in a way that would cause them to choose DET (or another licensee) rather than Iron Horse, as did the defendant juice company in *POM Wonderful*. DET's deceptive statements did not cause consumers to "withhold trade from" Iron Horse. *See Lexmark*, 572 U.S. at 133. Therefore, Iron Horse has not suffered "injury to a commercial interest in reputation or sales" caused by DET deceiving Iron Horse's would-be consumers, as required for standing under the Lanham Act.

C. *For Monopolization, Iron Horse Lacks Standing.*

Monopolizing or attempting to monopolize trade is a felony, and anyone injured by monopolization or attempted monopolization can bring a civil lawsuit. *See* 15 U.S.C. §§ 2, 15. To have statutory standing, among other requirements, "a plaintiff must have had '(1) an intention to enter the business, and (2) a showing of preparedness to enter the business.'" *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015) (quoting *Hayes v. Solomon*, 597 F.2d 958, 973 (5th Cir. 1979)). To the extent the plaintiff was prevented from preparing to enter the business, it must flow from the alleged anticompetitive conduct (here, monopolization), not from unrelated obstacles. *See id.* at 740.

DET challenges whether Iron Horse meets these requirements with respect to its intention and preparedness to compete in providing core-replacement services. *See* Doc. 118, Br. Mot., 14. Iron Horse responds that it meets all of the "antitrust injury" requirements. *See* Doc. 121, Br. Resp., 13–14. The Court agrees with DET: Iron Horse did not intend or prepare to compete as a core-replacement service provider, so although it might be a dissatisfied customer with other claims, it does not have antitrust standing.

Iron Horse lacks statutory standing for a monopolization claim because it never had any intention to perform core-replacement services and showed no preparedness to do so. Ashworth disclaimed any intention to incorporate core-replacement services into his business. *See* Doc. 122, App. Resp., Ashworth Dep., 100:15–24. Nevertheless, Iron Horse argues that it "took concrete steps toward entry [into the business], such as purchasing and financing the [Recore] press, signing the [Master Services Agreement], and integrating Recore services into its DPF business." Doc. 121, Br. Resp., 14. The first two of Iron Horse's "concrete steps"—purchasing Recore and signing the Master Services Agreement—are simply the steps of becoming DET's customer and licensee, not of competing in the business. On its last "concrete step," Iron Horse points to no evidence that it integrated Recore services into its business, and instead Ashworth testified that his business did the opposite.

Moreover, the myriad obstacles preventing Iron Horse from doing core replacement did not include DET's supposedly monopolistic conduct. Iron Horse paints DET's conduct as "foreclosure of alternatives, supracompetitive pricing, and exclusionary use of (purported) intellectual property rights" that harmed Iron Horse's ability to compete. *See id.* at 14. This argument fails because, even if DET's aim was to restrain Iron Horse from looking at alternative options for core-replacement services, the undisputed evidence shows that Iron Horse had no desire to look for alternatives. Iron Horse could not have been injured in its ability to compete if the reason it did not compete is because it did not want to. As noted above, Iron Horse never entered the core-replacement business because of anticipated tension with DPF Alternatives, the instruction from DPF Alternatives not to use Recore, and/or Ashworth's own lack of interest. True, as Iron Horse points out, DET eventually terminated the Master Services Agreement, which meant that Iron Horse could no longer use

Recore. *See* Doc. 121, Br. Resp., 14. But, by that point, the Recore system was not something Iron Horse had any intention of using—it was just "sit[ting] in [the] shop." *Id.* at 61:12.

At bottom, Iron Horse's injury of being lulled by DET into accepting unfavorable contractual terms is that of an unsatisfied customer and licensee, not an antitrust plaintiff. The Court therefore grants summary judgment to DET on the monopolization claim.

*D. Tortious Interference Fails.*

Tortious interference has four elements: "(1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred." *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997) (citation omitted). "Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference."[5] *Id.* (citations omitted).

Iron Horse's tortious interference claim fails for two reasons. First, Iron Horse has not suffered any damage with respect to its contractual relationship with DPF Alternatives. Ashworth testified that Iron Horse is still a franchisee of DPF Alternatives. *See* Doc. 122, App. Resp., Ashworth Dep., 63:3–5. Although having bought Recore and the license to use it financially strained Iron Horse's business, *see id.* at 62:25 to 63:2, DPF Alternatives has never communicated that Iron Horse's financial strain was affecting the franchise relationship. *See id.* at 63:9–12. In its brief, Iron Horse refers to this portion of Ashworth's deposition testimony as a non-dispositive "snippet," *see* Doc. 121, Br. Resp., 16, but even if so, Iron Horse never raises other evidence supporting damage to its contractual relationship with DPF Alternatives. Iron Horse points to the "authorized vendor"

[5] The one exception is that a cause of action exists for tortious interference leading to termination of an at-will employment contract, even though the employer has the right to terminate at will. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989).

dispute between DET and DPF Alternatives, DET's false patent claims, and DET's termination of the Master Services Agreement covering use of Recore. *See id.* at 16–18. Besides arguing in its briefing that these actions made it more difficult for Iron Horse to perform under its franchising agreement, Iron Horse points to no evidence of an obligation in its franchise agreement for which performance was strained. As Ashworth testified at his deposition, the only effect supported by the evidence is a strain to Iron Horse's own finances, not to its contractual relationship with DPF Alternatives.

Second, Iron Horse has provided no evidence of "actionable interference" by DET to disrupt the franchise relationship between Iron Horse and DPF Alternatives. At the time DET and Iron Horse agreed on the Master Services Agreement, DET was an approved vendor for DPF Alternatives' franchisees. *See* Doc. 122, App. Resp., Ashworth Dep., 89:1–6. By contracting with Iron Horse, DET induced Iron Horse to do something that it not only had a right to do, but that was—at the time—endorsed by DPF Alternatives. *See ACS Invs.*, 943 S.W.2d at 430. The falling-out between DET and DPF Alternatives happened later. *See* Doc. 122, App. Resp., Ashworth Dep., 64:4–7, 103:8–20. Although Iron Horse did not use Recore due to Ashworth's sense that using it would put him in "hot water" with DPF Alternatives, *see id.* at 61:11–23, that tension resulted from restrictions imposed by DPF Alternatives *after* Iron Horse had already contracted with DET. Iron Horse has pointed to no evidence that DET did anything to interfere with that restriction once it was imposed or to otherwise interfere in the franchise relationship.

The Court therefore grants summary judgment to DET on Iron Horse's tortious interference claim.

*E. Unlawful Cancellation of Franchise Under Virginia Law Fails.*

Iron Horse's franchise-cancellation claim asserts that the Master Services Agreement made it a "franchisee" of DET under the Virginia Retail Franchising Act ("VRFA") and that DET unlawfully cancelled the franchise when it terminated the Master Services Agreement. *See* Doc. 89, Second Am. Compl. ¶¶ 177–85. DET argues that the choice-of-law provision in the Master Services Agreement, which specifies that Texas substantive law will apply to the relationship, forecloses Iron Horse's VRFA claim. *See* Doc. 118, Br. Mot., 18–20. Iron Horse does not dispute the validity of the choice-of-law provision in the Master Services Agreement but argues that Virginia's statutory protection overcomes the parties' mutually agreed-upon choice of law. *See* Doc. 121, Br. Resp., 18–19. The Court agrees with DET: the Virginia statutory claim is foreclosed by the contract.

Before getting to the contract, Texas choice-of-law rules (as in, Texas's procedural rules about which substantive law to choose) apply because "[a] federal court is required to follow the choice-of-law rules of the state in which it sits." *Goosehead Ins. Agency, LLC v. Williams Ins. & Consulting, Inc.*, 533 F. Supp. 3d 367, 381–82 (N.D. Tex. 2020) (O'Connor, J.) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Texas law, "in those cases in which the parties have agreed to an enforceable choice-of-law clause, the law of the chosen state must be applied." *Id.* at 382 (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)). The question turns, then, on whether the choice-of-law clause is enforceable.

Texas courts treat choice-of-law clauses as enforceable except in two circumstances. *See id.* The first exception applies if "the chosen law"—here, Texas substantive law—"has no substantial relationship with the parties." *Id.* (citation omitted). Iron Horse raises no argument against DET's assertion that Texas law has a substantial relationship based on DET's presence in Texas.

That leaves the second exception, which applies if "there is a state with a materially greater interest in the dispute *and* applying the chosen law is against the fundamental policy of the state with materially greater interest." *Id.* (citation omitted). Iron Horse seems to argue that its presence in Virginia gives rise to Virginia's materially greater interest in the dispute and that the VRFA "embodies Virginia's fundamental public policy." *See* Doc. 121, Br. Resp., 18–19.

Iron Horse fails to persuade the Court that the VRFA is powerful enough to overcome the parties' mutual choice of Texas substantive law. Suggesting its inability to so argue, Iron Horse writes that "franchise statutes *like* the VRFA embody strong public policies and *often contain* anti-waiver provisions." *Id.* at 18 (emphases added). But Iron Horse fails to point to the "strong public policy" embodied in the VRFA or an anti-waiver provision in the VRFA. And, for that matter, Iron Horse does not point to *any* state with a franchise-protection statute that overcame a contrary choice-of-law provision. The three cases that Iron Horse attempts to use undermine its point. *See Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1139–40 (6th Cir. 1991) (holding that applying Michigan choice-of-law provision in franchise dispute does not offend Alabama public policy); *Cottman Transmission Sys., Inc. v. Melody*, 869 F. Supp. 1188, 1190 (E.D. Pa. 1994) (disposing of California statutory claims where Pennsylvania choice-of-law provision applied); *TCBY Sys., Inc. v. RSP Co.*, 33 F.3d 925, 930 (8th Cir. 1994) (affirming dismissal of Minnesota Franchise Act claims because Arkansas choice-of-law provision applied).[6] Thus, Iron Horse has failed to persuade that its VRFA claim can be asserted.

---

[6] Iron Horse seems to have pulled these three cases from DET's brief and cited them for the opposite of what they actually say. *Compare* Doc. 118, Br. Mot., 19 (citing *Moses*, *Cottman*, and *TCBY* and correctly describing them), *with* Doc. 121, Br. Resp., 18–19 (citing same three cases for opposite point that "[c]ourts routinely refuse to enforce out-of-state, choice-of-law provisions where doing so would undermine a state's franchise protection statute"). For the *Moses* case, Iron Horse used this inaccurate parenthetical: "Michigan franchise statute trumped contrary choice-of-law clause." Doc. 121, Br. Resp., 19. In *Moses*, the choice-of-law clause referred to Michigan law, and there was no franchise-specific statute discussed from the other state (Alabama). *See Moses*, 929 F.2d at 1139–40.

Finally, contrary to Iron Horse's assertion that choice-of-law is a "fact- and policy-intensive question inappropriate for summary judgment," *see* Doc. 121, Br. Resp., 19, the Court—not a factfinder—must decide the legal issue of which law applies. *See Woodfield v. Bowman*, 193 F.3d 354, 358 (5th Cir. 1999) (citation omitted) (identifying choice of law as legal question). Because Iron Horse has not supported its legal argument that the VRFA trumps the contractual choice-of-law provision, the Court grants summary judgment to DET on the VRFA claim.

**IV.**

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** summary judgment to DET on Iron Horse's claims for false-marking claim under 15 U.S.C. § 292(a), false description under 15 U.S.C. § 1125(a), monopolization under 15 U.S.C. § 2, tortious interference with contract, and unlawful cancellation of franchise under Virginia Code section 13.1-564.

**SO ORDERED.**

**SIGNED: August 26, 2026.**

JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE